Our next case is in-depth test versus maxim. Integrated Products and Vishay Intertechnology 2019, 1409 and 1410. Mr. Greenspone. Thank you, Your Honor, and good morning, Your Honors. May it please the court. Once the district court accepted the detailed agreed patent lexicography claim construction for outlier, in this case, that crystallized patent eligibility for the asserted claims. It was no longer possible to view the claims as simply using a computer as a tool, because under this court's case law, the prohibited mere use of a computer as a tool means adding computer functionality to well-known business practices, doesn't satisfy that checkbox, or performing conventional activities on a computer. It doesn't satisfy that checkbox either. Instead, regarding conventionality, your claims, which are quite limited, testing a component, generating test data, computer configured to receive the data, identify an outlier. Larry, when I look at your specification, every one of these limitations seems to refer to, according to any suitable algorithm, any appropriate classification methods, nothing is specialized at all in general. I would disagree with you, particularly, Your Honor, with identifying an outlier, and that's why I focused immediately on the claim construction, because the claim construction sets forth an inventive application. In other words, the claim construction does things never done before in the semiconductor testing arts. It was specific analysis of passing semiconductor components, not done before. Instead, the conventional semiconductor tester was only going to look for pass-fail, without any regard for what utility might come about if you look at the passing components and do some extra work with those. So your invention is to add to the pass-fail a category of high pass, in effect? Or adding pass to high pass and fail? I want to be precise, it's adding outlier. Well, I understand, but outlier is really nothing more, is it, than simply saying something that does not fail, but nonetheless is not as high a quality as we're going to insist on for certain purposes. Well, Your Honor, dismiss that by saying it's merely that, but this was actually a point of... Well, okay, but is that a fair characterization? I'll strike the merely. It was that and more, because what it permitted when you were identifying outliers, you had two particular improvements in the machinery that were never before realized. Improvement number one was you can now do grading of reliability classifications without doing a second battery of tests. That was revolutionary. Then the second improvement, and this is mentioned in our briefing as well, is that you can use the outlier outcomes for a test and determine if the testing protocol itself is sound. And the last column, column 18 of the patent, goes into this in the most detail. But what that means is, let's say you have 200 tests on a component, or 200 tests across all the components on a wafer. You find that test number 100 creates a certain outlier fingerprint. Then you find that test number 150 creates the identical outlier fingerprint. Well, that's a very strong clue now to the operator, that 100 and 150 among the test protocols are redundant, and you can eliminate one. If you look in the background of the invention, there's a lot of discussion about how important it is to limit the amount of testing that has to be done. The assembly of the test rig is painstaking. That's a word in the patent. And the performance of the actual tests take a lot of computing power to do. So a huge advantage, what I'm calling advantage number two today, to create a system and an invention, a new technology, an improvement to the existing technology that lets you actually compress the testing protocol for future tests. So it's not just reliability classifications. It's also creating this possibility that the operator can now improve the test rig itself on an operational basis. So how do we know that the outlier limitation improved in existing technology? There are three reasons we know that for sure. Reason number one, the patent trial and appeal board on six different occasions, at least five occasions with the PTAB1 and re-examination, found that the outlier limitation was not found in the prior art. These were adversaries who threw their best at it. And instead, all they could come up with were items of prior art that just did the past fail. What your honor, Judge Bryson, you're calling the in-between just wasn't thought of, it wasn't done in the prior art. Nobody recognized the advantages that could come about from using that. The second reason we know that this is an improvement to an existing technology is the ability to do the reliability classifications. Like I just mentioned, in the greatest detail in the preferred embodiment, it talks about critical, marginal, and good. But you can go from there. And then the third reason why this improved in existing technology is what I mentioned. It permitted the operator to actually improve the testing process itself. I can't understate how important that is. Or can't overstate. So the specific improvement in the way the outliers change semiconductor testing equipment is embodied in the claim construction. It improved the functionality of an existing technological process. And because of that, it lines up beautifully with prior cases of this court where it found similar things and found patent eligibility. And your honors know the catalog of cases. I mentioned NPHISH, Amdocs, FinGen. And what's more, there was a specific implementation. So when I mentioned the claim construction for outlier, it actually had quite a bit of detail in it. Implicit in the claim construction, one had to find a statistical baseline. That's the starting point. It's not the end point, it's the starting point. So imagine a scenario where those 200 tests were performed on 2,000 components. Now we're going to find the statistical baseline for each component test among the 2,000 samples. The second part of identifying an outlier is you eliminate the failures. That doesn't use statistics, that's just using pre-assigned control limits. So you eliminate the failures. The failures are strays, but you eliminate them. Then the third step is what you have left, are what the patent calls outliers. And by the way, this is using the term outlier in an unconventional way as well. So the claim language is pure patent lexicography. Because there was a sort of art known use or connotation for the word outlier, the connotation in the prior art was a failure. We're not using the word outlier here in the context of a failure. There's a pure claim construction here where it's got to be a stray above or below that statistical baseline, but one that does not fail. We have a reproduction of Figure 9 in our briefing, and it shows white triangles. It's a highly stylized figure, of course, but it shows that, just to illustrate the principle, the wavy line in the middle is the statistical baseline. The black circles that go above the limits, those are the failures. And then the white triangles above and below the statistical threshold are the outliers. So on step one of ALICE, KPN, we would submit is an excellent roadmap or contains an excellent roadmap for how to proceed. KPN, of course, starts with finding what is the focus of the claim, what is the asserted advance over the prior art. In this case, that's certainly identification of outliers. I think there's actually agreement between the parties that the quote-unquote focus of the claim is identification of outliers. And then in KPN, it synthesizes a lot of the prior case law by saying you look at what were the goals or the intended results or desired results from the focus of the claim. So the goal and the intended or desired result in this case were the things I just mentioned. More generally, improving semiconductor testing equipment, improving reliability testing in semiconductor testing equipment. But this isn't what the claims recite. The claims at bottom recite receiving data, identifying an outlier, and generating report. So there's... Exchanging data. Just as an aside, the claim is about as long as the claim in Fingen, the Fingen case. But, of course, that ended up with a holding of eligibility. So I think everyone can agree that the length of the claim by itself, whether it be very long or very short, is not dispositive. I didn't mention the length. I mentioned the limited limitations. And what Your Honor mentioned is that the performance of reliability classification, for example, is not a claim limitation. I would agree. But KPN teaches that the advantage of the claim doesn't have to be recited as a claim limitation for this analysis to proceed. So the key point in KPN, and this will put the bow on it, is that as long as the claim limitation is not simply claiming the intended result, that there's something more, there's more detail, there's more specificity in there, then you can pass it, Alice, step one. I see I'm into my rebuttal time. I would simply ask that the Court reverse the district court, and I'd like to reserve the rest of my time for rebuttal. We will do that, Mr. Queensborough. Mr. Barkan. Good morning. May it please the Court. As Your Honor's questions indicated, these claims are incredibly broad. And for each element in the claims, the specification tells us these are conventional components. Conventional tester, conventional computer hardware, conventional report, and outliers to be designated in any suitable manner. Now, what we hear from in depth today is that the unconventional aspect is the identification of outliers. But of course, this Court's precedent says that the abstract idea cannot itself supply the unconventional aspect for step two. There has to be something other than the abstract idea, because an abstract idea, no matter how novel or non-obvious, is still an abstract idea. And when counsel said that these claims line up with the Court's precedent, I agree. But it doesn't line up with NFISH or Amdocs. It lines up with SAP America, electric power, digitech, content extraction, all cases that involve the organization of data. And these claims really are about simply organizing data and selecting a subset of results. We can see that from Figure 9, which in depth counsel mentioned. That's a visual depiction of what an outlier is. And in fact, we can see in there that this is an operation that humans could perform. You plot the data. You show where they exceed the pass-fail, the control limits. And then anything in the middle that stands out is an outlier. That's all there really is here. Now, one thing that's important here is that in in-depth briefing, for the first time we hear a revised claim construction. There was a stipulated claim construction below. And the lexicographer's claim construction. Where is the stipulated construction found? It's in the Court's Markman ruling. And it is the same construction that was offered. Can you give me a JAP? I would like to be looking at it as you talk. I'm not finding it in the appendix. Does one of the briefs quote it? Yes, that's what I'm looking for, Your Honor. On page nine of the blue brief, there is a, no, that's just the claim. I do have it written out, Your Honor. It's directly from the specification. So we can find it in the patent. That little passage in column 644. Yes, it's exactly that. It's an outlier. It's a test result. It's in column 6. A test result that strays from the first set of results, but does not exceed control limits. Now, that was the agreed upon claim construction. And what's significant is that that tells us what an outlier is, but not how to determine an outlier. The how we see for the first time in the new construction that is proposed by in-depth in their briefing, where they come up with a series of rules. Those rules were nowhere mentioned in the district court proceedings, and they weren't proposed in any claim construction by in-depth. And, in fact, they don't really follow the specification either, because the specification tells us, as we've seen, that outliers can be designated in any suitable manner, and there's no particular order of steps.  There's no requirement that a threshold be used to determine an outlier. If you look at figure 9 of the patent, which visually illustrates what an outlier is, it shows a threshold for the control limits, but it shows no threshold for the outliers. They simply stand out by the fact that they deviate from the bulk of the results by some amount.   that a threshold be used to determine an outlier. What that means is that there's nothing in the claim that renders this non-abstract or unconventional. And so when I heard counsel talk about the various applications of outliers, how it can be used to improve the manufacturing process, those are all unclaimed applications. An unclaimed element cannot supply either the non-abstractness or the unconventionality. Is it now, as the case comes to us, agreed between the parties that we can look at Claim 1 and if Claim 1 is ineligible, end of matter? Yes, Your Honor. That's how the district court treated it. And there's no separate argument in the blue brief that even if Claim 1 went down, other claims survive, right? That's correct, Your Honor. Yes, it all stands and falls on Claim 1. With respect to the assertion by In Depth that they were the first ones to do something other than pass-fail kind of testing, the specification tells us that that's not true. If you look at Column 1, the background of the invention, there's a description, Column 1, Line 30 through Line 42, of what many semiconductor companies used to do. And one of the things that it talks about is that the data they collected may be analyzed to identify common deficiencies or patterns of defects or identify parts that may exhibit quality and performance issues and to identify or classify user-defined good parts. So these aren't merely parts that don't operate or fail a control limit, but these are user-classified or user-defined good parts, what the semiconductor field used to call known good parts. So sometimes they would take their parts as they come off the assembly line and say, well, this one's good for a high-speed part, this one's good for a medium-speed application, this one's good for a low-speed. And the specification is describing that in Claim 1. And so we have everything we need here in the specification to confirm the conventionality of each of the elements of the claim. Is the portion that you just read understandable as just applying slightly different definitions according to different circumstances of a simple binary pass-fail? If I understand Your Honor's question, I think what it's talking about... A non-good part is a fail. I don't believe that's correct, Your Honor, because of the user-defined and the reference to performance issues. So parts that fail are parts that are inoperable. You wouldn't be able to sell them. There are parts that meet the control limits, but which still may be, for quality reasons, something that you don't want to sell. So it's an operable part, but it may be of lower quality. And that's the reference to user-defined good parts. That was a known term in the semiconductor field. If the panel has no further questions, that will complete our argument. Let me just, on your last point, see if I understand. You said that the term user-defined good parts was used in the semiconductor field to refer to what exactly? To refer to parts where they pass the control limits. So if it said that it has to be able to stay below a certain temperature while it's being tested, the part might stay below that temperature, but it still might be too close to that value. So in other words, the equivalent, at least as you see it, of outlier. Yes. Thank you, counsel. Thank you, Your Honor. Mr. Greenspoon has some rebuttal time. Thank you, Your Honors. I would agree with the suggestion of yourself, Judge Bryson, and Judge Serrano, that that column one excerpt is merely setting up the generalized problem of semiconductor testing, of separating the good from the bad. That's the old, unsophisticated way. So you can test for good, you can test for bad, but column one doesn't suggest that the folks in the art were doing anything other than that. There's nothing in between. There's no kind of good enough for government work. But there's no concept of medium enough for government work. So then going back to some of the things said, first off, I'd like to refer, Your Honors, to appendix page seven. It's actually connected to the blue brief. That's where the claim construction is. And I would certainly dispute the idea that we're rewriting the claim construction or trying to come up with a new one. In the middle of appendix page seven, okay, if you're ready, I'll start. The court says, the written description of the patent defines outlier as a test result that strays from a set of test results that did not exceed the control limits specified for the tested component or otherwise fail and that have statistically similar values. So one of the concepts or notions baked into this claim construction, left out by my brother, is the notion at the very end, statistically similar values. That's where we get, it's intrinsic to this claim construction that there's a statistic baseline that's taken first. Everything outside that level of statistical similarity is considered a stray. Strays that fail the control limits fail. Strays that pass the control limits are considered outliers. That's why there's, this is all jumping straight off the page of just the words that I read to Your Honors. And then the final, the only final point I'd like to make for Your Honors, unless there are any further questions, is that unconventionality absolutely, under this court's case law, is significant for Alice, step one. And the particular cases that are best to illustrate this are Fingen, McRow, and even- Can I just ask you on the statistically, what is the term, the statistical, statistically similar values. I see, that's in the first part of the column six citation. Sorry, okay. Not in the second part of it. That perhaps is true. There are two paragraphs in column six that are supposed to be read together. That's right. So back to unconventionality within Alice, step one. It's absolutely a factor, and I just mentioned Fingen, McRow, and even electrical power group, even though that was a case that eventually ended up with a holding of no eligibility the reason why there was no eligibility under electrical power group was because there was no quote-unquote new technology for performing the analysis function. That's at the very end of the section describing Alice, step one, in that opinion. So the necessary implication is if there had been a new technology for performing the analysis function that's described in that decision, then there would have been a stronger consideration for passing Alice, step one. Let me ask you, what exactly do you think, how do you take from the words statistically similar values? What does that suggest to you? Personally, I thought the grammar of the district court was a little bit, it hangs together, but it took a little bit of time to read through it and understand it, and I had to understand it in the context of the cited column six. So if you read column six, it's very clear on what's going on at the detail level, which is there's a statistical threshold. So the deepest detail, that could be one standard deviation among, let's say, the 2,000 samples in the trial. It could be two standard deviations. In other words, what you're saying, I take it, is that the statistically similar values term means departing from the ideal group of results by a certain amount. Oh, it's not ideal, it's empirical. Well, when I say ideal, I mean, you have three sets of test results. You have the succeeds fabulously results, you have the fails miserably, and then you have the outliers in between. If I may adjust what Your Honor said, just in one way, you don't start knowing that it's going to be three. I understand that. You could end up with no options. But when you finish your testing, you end up with, I understand it, you end up with three categories. That's right. One is ready to go, nil, spec, perfect, whatever you want, or within the tightest of your controls. You have another group that have failed altogether. Correct. And you have a third group, which are outliers. And by virtue of your defining them as outliers, that is to say they are not in either one of those groups, then that becomes a statistically similar value for each of those outliers. Isn't that correct? Not at all. Well, nothing you just said told me why that isn't an accurate description of the outliers and the term statistically significant. Help me with that. If you have 2,000 samples that you apply statistics to, you do some math and you get a standard deviation. I'll use that as an example. You have to use all 2,000 samples to know what the standard deviation is for the whole group. What this is saying, if that's going to be your threshold, this is saying if it passes but it's above one sigma, we're going to call that an outlier. And we're going to call it a stray also, but that's another term. So it's a stray slash outlier. Okay. So that's why, let's say, all the white triangles together in Figure 9, you wouldn't bunch them together and say, oh, those are statistically similar to one another. The statistic similarity exercise is first done on the 2,000 samples. I understand that. But when you finish, you have three sets of results. One, within the narrow confines. Two, outside of the broad confines. And three, whether it's one sigma or more, is what's left. And those are, by definition, I take it by your description that you just gave me, statistically significant values. Right? If I may, Your Honor. Yes, please. Of course. Those are significant in the context of the machinery and what you can do with them. All right. Yes. All right. Fine.  Thank you, Your Honor. Thank you, counsel. The case is taken under revised. All right.